IN THE UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

| | | |
|---|---|---|
| **MARVIN JONES,** | ) | **Civil Action No. 4:10CV-011-P-S** |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TYSON FOODS, INC.; HALEY** | ) | |
| **BARBOUR, in his official capacity of** | ) | |
| **Governor of the State of Mississippi;** | ) | |
| **CHRISTOPHER EPPS, in his** | ) | |
| **individual and official capacities as** | ) | |
| **Commission of the Mississippi** | ) | |
| **Department of Corrections; LEE** | ) | |
| **McTEER, in his official capacity as** | ) | |
| **Community Correctional Director for** | ) | |
| **Region I and in his individual capacity;** | ) | |
| **and JONATHAN BRADLEY, in his** | ) | |
| **official capacity as Correctional** | ) | |
| **Supervisor of Leflore County** | ) | |
| **Restitution Center and in his individual** | ) | |
| **capacities** | ) | **JURY TRIAL DEMANDED** |
| | | |
| Defendants. | | |

## FIRST AMENDED COMPLAINT

Plaintiff, by and through his attorney, for his First Amended Complaint allege, upon

knowledge as to himself and otherwise upon information and belief, as follows:

### I. PRELIMINARY STATEMENT

1.      This is a civil action brought pursuant to 42 U.S.C § 1983 that seeks to remedy the

unconstitutional deprivation of Plaintiff's statutory and constitutional rights. The conduct by

Defendants, acting in concert with their officers, agents, servants, employees and attorneys, and all

other persons in active concert or participation, violates plaintiffs' rights, privileges, and immunities

1

under the United States Constitution, as amended, specifically the cruel and unusual punishment clause of the Eighth Amendment, indentured servitude clause of the Thirteenth Amendment and the Due Process clause of the Fourteenth Amendment.

2.      This action is also brought pursuant to 42 U.S.C. § 1985 and alleges that Defendants conspired to deprive, by force intimidation or threat, Mr. Jones from receiving his freedom after he satisfied the terms of his sentencing. Defendant conspired and intended to deny Mr. Jones his civil rights and conspired to intimidate him to achieve such a goal.

3.      Defendants, by violating Mr. Jones's substantive due process rights and denying him his freedom, have violated the public trust and utilized unconstitutional means to keep Mr. Jones an indentured servant. This case is about a failure to take the necessary steps to protect Mr. Jones from being catapulted back to a time that stained the moral fabric of this great country. It is also a case that seeks to protect the public health and compensate Mr. Jones after he contracted TB due to Defendant's negligence.

4       The relief Plaintiffs seek is supported by satisfactory proofs, including the public records, facts and other documentation referenced throughout the Complaint.

5.      Mr. Jones seeks nominal, actual and punitive damages against Defendants for the flagrant, willful, knowing, violation of his Eighth, Thirteenth and Fourteenth Amendment rights and their violations of federal statutes and state law torts, as well as the costs of litigation, including reasonable attorney's fees.

## II.      JURISDICTION

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(3)(4), which confers original jurisdiction on federal district courts to redress the deprivation of rights, privileges and immunities as stated herein.

2

7. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. sec. 1367.

## III. VENUE

8. Venue is proper in the United States District Court for the Northern District of Mississippi, Greenville Division, pursuant to 28 U.S.C. § 1391(b), because a majority of the claims arise in Leflore County, Mississippi.

## IV. IDENTIFICATION OF PLAINTIFF

9. Plaintiff, MARVIN JONES is an adult resident citizen of 158 Lee Street, Columbus, Mississippi 39701.

## V. IDENTIFICATION OF DEFENDANTS

10. Defendant, TYSON FOODS, INC., hereinafter "Tyson," is a corporation incorporated under the laws of, and doing business in, the State of Mississippi. It may be served with process upon its registered agent, C T CORPORATION SYSTEM, located at 645 Lakeland East Drive, Flowood, Mississippi 39232.

11. Defendant HALEY BARBOUR, who is sued in his official capacity only, is the Governor for the State of Mississippi, heads the Executive Branch of Mississippi's state government and is an adult resident of Yazoo County, Mississippi. Defendant Barbour oversees and directs the activities of the Mississippi Department of Corrections pursuant to Miss. Code Ann. §§ 7-1-5 and 47-5-8. The Governor of Mississippi, as chief of the Executive Branch, has the duty to ensure that the departments that compose the Executive Branch of Mississippi guarantee the federal constitutional and statutory rights of the inmates housed in correctional facilities owned and operated by, or providing services on behalf of Mississippi. Defendant Barbour, pursuant to Miss. Code Ann. § 99-37-19, holds the responsibility of supporting the operation of, and having sole jurisdiction over and responsibility for offenders in, such restitution program. His business address

3

is Post Office Box 139, Jackson, Mississippi 39205. He may be served with process by personal service at the Governor's Mansion located at 401 Mississippi Street, Jackson, Mississippi 39205.

12.     Defendant, CHRISTOPHER EPPS, who is sued both individually and in his official capacity, is the Commissioner for the Mississippi Department of Corrections. Mr. Epps oversees and directs the Department of Corrections pursuant to directs the activities of the Mississippi Department of Corrections pursuant to Miss. Code Ann. § 47-5-8. He may be served with process at 723 N. President Street, Jackson, Mississippi 39202.

13.     Defendant, LEE McTEER, who is sued both individually and in his official capacity, is the Community Correctional Director for Region I. The region includes the Leflore County Restitution Center, hereinafter "LCRC." The LCRC is charged with housing probationers referred by the circuit courts as well as inmates transferred from other facilities of the Department of Corrections pursuant to by Miss. Code Ann. Sec. 99-37-19. Defendant McTeer is responsible for the day-to-day operations of this facility, as well as supervising all conditions and practices therein. He may be served with process by personal service at 308 Highway 7 North, Greenwood, MS 38935.

14.     Defendant JONATHAN BRADLEY, who is sued both individually and in his official capacity, is the Correctional Supervisor at LCRC. Defendant BRADLEY is responsible for the day-to-day operations of this facility, as well as supervising all conditions and practices therein. He may be served with process by personal service at 308 Highway 7 North, Greenwood, MS 38935

## VI.     STATEMENT OF FACTS

15.     Mr. Jones contracted Mycobacterium tuberculosis (TB), a serious and often deadly infectious disease, because he was exposed to the disease while he was fulfilling the terms of his restitution while fulfilling the terms of his restitution at Defendant Tyson. Mr. Jones was arbitrarily assigned to the chicken plant by Defendant Bradley.

4

16.     On or about August 26, 2009, the Leflore County Restitution Center received, via certified mail, Plaintiff's ninety (90) day notice of claim pursuant to Miss. Code. Ann. 11-46-11, et seq. *See* Notice of Claim attached hereto as Exhibit "A."

17.     On or about August 27, 2009, the Mississippi Department of Corrections received, via certified mail, Plaintiff's ninety (90) day notice of claim pursuant to Miss. Code. Ann. 11-46-11, et seq. *See* Notice of Claim attached hereto as Exhibit "B."

18.     On or about September 17, 2009, the Mississippi Tort Claims Board, on behalf of the Department of Corrections, notified Plaintiff they rejected his claim. See letter from Mississippi Tort Claims Board, attached hereto as Exhibit "C."

19.     On or about September 29, 2009 the Mississippi Attorney General's Office received, via certified mail, Plaintiff's ninety (90) day notice of claim pursuant to Miss. Code. Ann. 11-46-11, et seq. *See* Notice of Claim attached hereto as Exhibit "D." No response was received by Plaintiff.

**Plaintiff Subjected to a Work Environment Defined by Disease and Feces**

20.     In September of 2007, Mr. Jones was assigned to LCRC after his release from a three-month term in the Clay County jail for embezzling money from a Dollar General. Defendant LCRC immediately assigned Mr. Jones to Defendant Tyson - at which point he assumed the duties of a "chicken hanger." He started his assignment October 2007 and his responsibilities included, but were not limited to; hanging live chickens on a moving wire by their feet, in an environment filled with dust, feathers, and chicken feces.

21.     The chicken hanging process, in which Mr. Jones was ordered to do to fulfill his restitution, is cruel and inhumane. After chickens are collected, usually under the darkness of night, and crammed into a cage where they can sit for up to nine (9) hours without food or water, the birds are transported to the slaughter house. *See* Poultry Slaughter: The Need for Legislation, attached hereto as "Exhibit E."

5

22.     Once inside the plant, chickens are collected by workers, such as Mr. Jones did, and are hung upside down by their feet while alive. *Id.* Such treatment creates a painful strain on the chickens' hips and waist and is inhumane in violation of Miss. Code. Ann. § 75-35-8.

23.     Defendant Tyson rewarded and encouraged such inhumane behavior by rewarding chicken hangers with an extra dollar an hour if they were able to "hang" twenty-five (25) chickens a minute.

24.     Defendant Tyson's chicken processing plant in Carthage, Mississippi created an unsanitary and unhealthy work environment. Mr. Jones had to conduct his work among chickens compelled to release feces due to the nature in which Defendant Tyson was processing the poultry. Mr. Jones would, at times, be covered in chicken feces.

25.     The unsanitary conditions created at Defendant Tyson's Carthage, Mississippi plant is further supported by the fact Mr. Jones conducted TB while working at the plant.

26.     The unsanitary conditions present at Defendant Tyson's food processing plants across the nation are well documented and have included Tyson workers urinating close to the slaughter line. *See* Highlights of the Investigative Report conducted by the People for the Ethical Treatment of Animals, attached hereto as "Exhibit F."

27.     All Defendants knew or should have known of the unsanitary conditions present at Defendant Tyson's Carthage, Mississippi facility.

28.     U.S. lawmakers have also recognized the inherent danger associated with the poultry industry and voiced concern that harsh demands issued by poultry employers place poultry worker's health in jeopardy. *See* Senate Sub-Committee Hears Testimony on Workplace Hazards, The Charlotte Observer, May 14, 2008, attached hereto as "Exhibit G."

29.     Former U.S. Sen. Ted Kennedy, D-Mass., admitted the dangers poultry workers face when he testified, "'Poultry workers' health and safety is threatened every day in a variety of ways.

6

Their hands are crippled by hours on an assembly line that moves too fast. They are forced to work when they are sick or seriously hurt." *Id.*

30. Mr. Jones suffered from these very injuries and Defendants were aware, or should have been aware, of the very dangers Mr. Jones was facing.

31 Defendant Tyson has a reputation of placing the bottom line before worker safety and has been charged with hiring illegal immigrants from Latin America who may have carried the TB virus into the Carthage, Mississippi plant. *See*, Occupation Hazards, October 1, 1999, attached hereto as "Exhibit H" and Tyson recruited illegals, INS says, *USA TODAY*, December 20, 2001, attached hereto as "Exhibit I."

### Plaintiff's Work Environment Begins to Take its Toll on his Health

32. As a result of being forced to fulfill his criminal sanctions in this environment, Mr. Jones's face, neck, and hands began to swell soon after his time at Defendant Tyson began. Mr. Jones spoke with a supervisor at Tyson about these medical ailments, and requested to see the company's nurse. The supervisor refused to allow him to go to the nurse's station.

33. In October of 2007, two weeks after he was assigned to Defendant Tyson, Mr. Jones, because of the medical ailments that developed while at Defendant Tyson and the problematic work environment, could no longer fulfill his obligations. He returned to Defendant LCRC where he waited for his next assignment from Defendant Bradley.

34. From October 2007 - December 2007, Mr. Jones was not assigned another job by Defendant LCRC, and/or Defendant Bradley and was essentially left in limbo.

35. Upon information and belief, failure to reassign Mr. Jones was based upon the fact he angered Defendant Bradley because he could not fulfill his duties at Defendant Tyson, thus negatively impacting any and all personal benefits Defendant Bradley is believed to have received from Defendant Tyson as a result of Plaintiff's placement. It was well known among residents at

7

LCRC that Defendant Bradley wanted as many of his residents as possible to be assigned to Defendant Tyson, even when other opportunities were available.

36. In December 2007, Mr. Jones was finally assigned a new assignment at the Greenwood Country Club as a groundskeeper. Mr. Jones was able to work productively at this new job, and the country club was satisfied with his performance.

37. Though he was productive in his new assignment, Defendant Bradley, once again, assigned him to Defendant Tyson in March of 2008. This was done contrary to Mr. Jones's best interest and despite the fact he had a medical condition hampering his productivity at Tyson. This decision was arbitrary and capricious, and upon information and belief, the reassignment personally benefited Defendant Bradley.

## Plaintiff Contracts a Dangerous and Deadly Disease

38. Defendants knew of the physical dangers awaiting Mr. Jones.

39. Upon information and belief, Defendants knew or should have known of the TB risk awaiting Mr. Jones and upon information and belief Defendant LCRC failed to follow the dictates of § 41-23-1, thus testing Mr. Jones monthly for TB.

40. Despite earning the money to satisfy his restitution and any other legitimate outstanding debt, Mr. Jones, against his will, was forced to remain at LCRC while at Defendant Tyson's Carthage, Mississippi plant.

41. In July 2008, Mr. Jones was released from LCRC and allowed to return home. However, rather than being the final closure to a troubled chapter in his life, Mr. Jones's newfound freedom was merely a brief respite from his hardships.

42. In February of 2009, Mr. Jones received a fateful letter from the Mississippi State Department of Health, attached hereto as "Exhibit J," informing him that he may have been exposed to Mycobacterium tuberculosis (TB) during his assignment at Defendant Tyson. Mr. Jones

8

went to a hospital to have a tuberculin skin test performed, and soon received his diagnosis. He has tuberculosis.

43.     Since his diagnosis, a deluge of agonizing symptoms has befallen Mr. Jones. He is currently suffering from muscle spasms, acute fever, night sweats, loss of appetite, weight loss, and a host of side effects from medications he must take. He is now unable to work.

## VII.    ALLEGATIONS OF LAW

44.     All acts of Defendants were conducted under the color and pretenses of the ordinances, policies, practices, customs, regulations, usages and/or statutes of the Counties of Leflore and/or Leake, as well as the State of Mississippi.

45.     Defendant McTeer, in his official capacity as Community Corrections Director for Region I, was a final policy maker, capable of ratification for LCRC.

46.     Defendant Bradley, in his official capacity as Correctional Supervisor of LCRC, was a final policy maker, capable of ratification for LCRC.

47.     It is the policy, practice or custom of Defendants to suppress the Eighth Amendment rights of those residents entrusted to their care.

48.     It is the policy, practice or custom of Defendants to suppress the Thirteenth Amendment rights of those residents entrusted to their care.

49.     It is the policy, practice or custom of Defendants to violate the procedural and substantive due process rights of residents entrusted to their care.

50.     The unlawful actions of Defendants, as alleged herein, were taken or ratified by final policy makers for LCRC and thus constitute policies, practices and usage sufficient to impose liability.

51.     Plaintiff's injury was intentionally inflicted upon him by Defendant Tyson.

9

52.     By forcing Mr. Jones to fulfill his restitution at the Defendant Tyson's Carthage,

Mississippi plant, thus depriving him of his freedom and subjecting him to cruel and unusual

conditions, Defendants caused Mr. Jones to suffer real and sustained damages.

53.     Defendants failed to train and supervise their officers, agents, servants, employees

and attorneys, and all other persons in active concert or participation.

54.     Defendants conspired to deprive Mr. Jones, by force, intimidation and/or threat,

from exercising any right or privilege of a citizen of the United States.

55.     Defendants' actions, as alleged herein, were made with actual malice and/or

constituted willful misconduct.

56.     In the alternative, Defendants' actions, as alleged herein, were negligent.

57.     Defendants' actions, as alleged herein, were conducted in bad faith for the purpose

of deterring the exercise of Mr. Jones's constitutional rights.

58.     At all times relevant, Mr. Jones's constitutional right to be free from cruel and

unusual punishment was violated.

59.     At all times relevant, Mr. Jones's constitutional right to be free from indentured

servitude and/or slavery was violated.

60.     At all times alleged herein, Defendants acted with deliberate indifference.

61.     Mr. Jones has suffered, is suffering and will continue to suffer injury to his

constitutional and statutory rights.

62.     As a result of Defendants' action, Mr. Jones has suffered injury to his constitutional

rights to be free from cruel and unusual punishment.

63.     As a result of Defendants' action, Mr. Jones has suffered injury to his constitutional

rights to be free from indentured servitude and/or slavery.

10

64. As a result of Defendants' action, Mr. Jones has been denied his substantive and procedural due process rights.

65. As a result of Defendants' conduct, Mr. Jones contracted the potentially deadly disease of TB.

## VIII. FIRST CAUSE OF ACTION - § 42 U.S.C. 1983
### (Thirteenth Amendment - Slavery/Involuntary Servitude)

66. Paragraphs 1 - 65 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

67. The unlawful actions of the Defendants, as alleged herein, constituted a violation of Mr. Jones's right to be free from indentured servitude and/or slavery.

68. Defendants had an affirmative duty to prevent such intrusions.

69. Mr. Jones has an established constitutional right to be free from indentured servitude and/or slavery.

70. As a direct and proximate cause of Defendants' actions, Mr. Jones's rights, as guaranteed by the Thirteenth Amendment, were injured.

WHEREFORE Plaintiff prays for relief against all Defendants as set forth below.

## IX. SECOND CAUSE OF ACTION – 42 U.S.C. § 1983
### (Eighth/Fourteenth Amendment – Cruel & Unusual Punishment)

71. Paragraphs 1 - 70 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

72. The unlawful actions of the Defendants, as alleged herein, constituted a violation of Mr. Jones's right to be free from cruel and unusual punishment.

73. Defendants had an affirmative duty to prevent such intrusions.

74. Mr. Jones has an established constitutional right to be free from cruel and unusual punishment

11

75.     As a direct and proximate cause of Defendants' actions, Mr. Jones's rights, as

guaranteed by the Eighth/Fourteenth Amendments, were injured.

WHEREFORE Plaintiff prays for relief against all Defendants as set forth below.

## X.     THIRD CAUSE OF ACTION - 42 U.S.C. § 1983
### (Fourteenth Amendment – Procedural and Substantive Due Process)

76.     Paragraphs 1 - 75 of the Complaint are incorporated herein by reference, the same as

though pleaded in full.

77.     The unlawful actions of Defendants, as alleged herein, deprived Mr. Jones of his

educational rights.

78.     As a direct and proximate cause of Defendants' actions, Mr. Jones's rights, as

guaranteed by the Fourteenth Amendment, were injured.

WHEREFORE Plaintiff prays for relief against all Defendants as set forth below.

## XI.     FOURTH CAUSE OF ACTION – 42 U.S.C. § 1985
### (Conspiracy to Interfere with Civil Rights)

79.     Paragraphs 1 - 78 of the Complaint are incorporated herein by reference, the same as

though pleaded in full.

80.     Defendants' action, as alleged herein, resulted in a conspiracy to deprive Plaintiff, by

force, intimidation and/or threat, from exercising any right or privilege of a citizen of the United

States.

81.     The actions of Defendants also resulted in a conspiracy to impede, hinder, obstruct

and/or defeat, in any manner, the due course of justice in the State of Mississippi.

82.     As a direct and proximate cause of Defendants' actions, Mr. Jones was injured in his

constitutional rights.

WHEREFORE Plaintiff prays for relief against all Defendants as set forth below.

12

## XIII. FIFTH CAUSE OF ACTION – 42 U.S.C. § 1983
## (Failure to Train and/or Supervise)

83. Paragraphs 1 - 82 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

84. Defendants have failed to provide adequate training to their administration, staff and/or faculty.

85. Defendants have failed to supervise their administration, staff and/or faculty.

86. Specifically, Defendants have failed to train and/or supervise their administration, staff and/or faculty from violating a resident's Eight, Thirteenth and Fourth Amendment rights.

87. Defendants' failure to train and/or supervise was the proximate cause of Mr. Jones's injuries.

WHEREFORE Plaintiff prays for relief against all Defendants as set forth below.

## XIV. SIXTH CAUSE OF ACTION – Supplemental State Claim
## (Gross Negligence)

89. Paragraphs 1 – 86 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

90. Defendants were grossly negligent in providing a sanitary work environment for Mr. Jones, thus causing him harm.

91. It was foreseeable that Defendants' negligent behavior would cause Mr. Jones harm.

WHEREFORE Plaintiff prays for relief against all Defendants as set forth below.

## XV. SEVENTH CAUSE OF ACTION – Supplemental State Claim
## (Negligence)

92. Paragraphs 1 - 91 of the Complaint are incorporated herein by reference, the same as though pleaded in full.

13

93.     Defendant Tyson was negligent in providing an unsanitary work environment for

Mr. Jones, thus causing him harm.

94.     It was foreseeable that Defendants' negligent behavior would cause Plaintiff harm.

WHEREFORE Plaintiff prays for relief against all Defendants as set forth below.

## XVI. EIGHTH CAUSE OF ACTION – Supplemental State Law Claim (Battery)

95.     Paragraphs 1 - 94 of the Complaint are incorporated herein by reference, the same as

though pleaded in full.

96.     Defendant Tyson, by knowingly and willfully harboring an unsafe work

environment, intentionally subjected Plaintiff to Mycobacterium tuberculosis; thus creating a battery.

97.     As a direct and proximate cause of the intentional conduct of Defendant Tyson

Plaintiff was battered.

WHEREFORE Plaintiff prays for relief against all Defendants as set forth below.

## XVII.    NINTH CAUSE OF ACTION – Supplemental State Claim (Intentional Infliction of Emotional Distress)

98.     Paragraphs 1 - 97 of the Complaint are incorporated herein by reference, the same as

though pleaded in full.

99.     Plaintiff suffers from Mycobacterium tuberculosis.

100.    Plaintiff contracted Mycobacterium tuberculosis because of the intentional actions of

Defendant Tyson to injure him.

101.    Defendant Tyson creation and maintaining of an unsanitary work environment of

Plaintiff intentionally caused such emotional distress.

102.    The actions of Defendant Tyson resulted in the intentional infliction of emotional

distress.

WHEREFORE Plaintiff prays for relief against all Defendants as set forth below.

14

## **PRAYER**

WHEREFORE, Plaintiff respectfully prays this Court:

a.  Assume jurisdiction over this action;

b.  Declare that Defendants' actions, as herein described, violated Plaintiff's constitutional rights under the Eighth, Thirteenth and Fourteenth Amendments to the United States Constitution;

c.  Award Plaintiff nominal and actual damages for Defendants' violation of his state and federal constitutional rights;

d.  Award Plaintiff compensatory and punitive damages against Defendants for the torts of negligence and gross negligence;

e.  Award Plaintiff his costs of litigation, including reasonable attorney's fees and expenses, pursuant to 42 U.S.C. sec. 1988; and

f.  Grant such other relief to which Plaintiff may be entitled or as this Court deems necessary and proper

Respectfully submitted,

Joseph R. Murray, II
MS Bar # 101802
Melissa Harrison
MS Bar # 100046
Harrison Law Office, PLLC
P.O. Box 468
114 East Jefferson Street
Ripley, MS 38663

15

## BEFORE THE LEFLORE COUNTY RESTITUTION CENTER

## NOTICE OF CLAIM OF MARVIN JONES FOR DAMAGES

Pursuant to Miss. Code Ann. § 11-46-11, et seq., notice is hereby given for a claim for damages for racketeering, gross negligence and negligence, as well as the violation of Plaintiff's Eight, Thirteenth, and Fourteenth Amendment rights, and other federal statutes. The Leflore County Restitution Center, hereinafter "LCRC," is liable to Marvin Jones for the aforementioned torts.

### STATEMENT OF THE FACTS AND CIRCUMSTANCES WHICH CAUSED THE INJURY

The circumstances giving rise to the claim are as follows:

Claimant, Marvin Jones, contracted Mycobacterium tuberculosis (TB), a serious and often deadly infectious disease, because he was exposed to the disease while he was fulfilling the terms of his restitution while working at Tyson Food, Inc., hereinafter "Tyson." Mr. Jones only became an employee of Tyson after he was arbitrarily assigned to the chicken plant by LCRC Correctional Supervisor Jonathon Bradley.

In September of 2007, Mr. Jones was assigned to LCRC after his release from a three-month term in the Clay County jail for embezzling money from a Dollar General. LCRC immediately assigned Mr. Jones a job at Tyson, at which point he assumed the duties of a "chicken hanger." He started his assignment October 2007 and his responsibilities included, but were not limited to; hanging live chickens on a moving wire by their feet, in an unsanitary environment. Mr. Jones would have to conduct his work among chickens compelled to release feces due to the nature in which Tyson was processing the poultry. Mr.

1



EXHIBIT

A

Jones would, at times, be covered in chicken feces. The air was also filled with chicken feathers and dust, which were circulated in the plant by large fans.

These unsanitary conditions present at Tyson's food processing plants across the nation are well documented. U.S. lawmakers have also recognized the inherent danger associated with the poultry industry and voiced concern that harsh demands issued by poultry employers place poultry worker's health in jeopardy. U.S. Sen. Ted Kennedy, D-Mass., warned of the dangers poultry workers face when by testifying before Congress that "[p]oultry workers' health and safety is threatened every day in a variety of ways. Their hands are crippled by hours on an assembly line that moves too fast. They are forced to work when they are sick or seriously hurt." Mr. Jones suffered these very same injuries, and as a consequence of such documented perils of the poultry industry, LCRD knew, or should have known, of the dangers Mr. Jones was facing.

Tyson has been investigated for hiring illegal immigrants from Latin America; an area prone to TB. LCRC knew or should have known of such hiring practices and taken steps to protect restitution workers.

As a result of working in this unsanitary and unsafe environment, Mr. Jones's face, neck, and hands began to swell soon after his employment began. Mr. Jones spoke with his supervisor at Tyson about these medical ailments, and requested to see the company's nurse. His supervisor refused to allow him to go to the nurse's station.

In October of 2007, two weeks after starting work for Tyson, Mr. Jones, because of the medical ailments that developed while working at Tyson and the problematic work environment, could no longer fulfill his work obligations. He returned to LCRC where he waited for his next assignment from Jonathan Bradley, Correctional Supervisor of LCRC..

2

From October 2007 - December 2007, Mr. Jones was not assigned another job by LCRC, and/or Mr. Bradley and was essentially left in limbo.

Upon information and belief, failure to reassign Mr. Jones was based upon the fact he angered Mr. Bradley because he could not work for Tyson, thus negatively impacting any and all personal benefits Mr. Bradley is believed to have received from Tyson as a result of Plaintiff's placement. Upon information and belief, it was well known among residents at LCRC that Mr. Bradley wanted as many of his residents as possible to be employed by Tyson, even when other job opportunities were available.

In December 2007, Mr. Jones was finally assigned a new job at the Greenwood Country Club as a groundskeeper. Mr. Jones was able to work productively at this new job, and his new employer was satisfied with his performance.

Though he was productive in his new job, Mr. Bradley, once again, assigned him to work for Tyson in March of 2008. This was done contrary to Mr. Jones's best interest and despite the fact he had a medical condition hampering his productivity at Tyson. This decision was arbitrary and capricious, and upon information and belief, the reassignment personally benefited Mr. Bradley.

In July 2008, Mr. Jones was released from LCRC and allowed to return home. However, rather than being the final closure to a troubled chapter in his life, Mr. Jones's newfound freedom was merely a brief respite from his hardships.

In February of 2009, Mr. Jones received a fateful letter from the Mississippi State Department of Health, informing him that he may have been exposed to Mycobacterium tuberculosis (TB) at his workplace when he was employed by Tyson. Mr. Jones went to a hospital to have a tuberculin skin test performed, and soon received his diagnosis. He has tuberculosis.

3

Since his diagnosis, a deluge of agonizing symptoms has befallen Mr. Jones. He is currently suffering from muscle spasms, acute fever, night sweats, loss of appetite, weight loss, and a host of side effects from medications he must take. He is unable to work because of his condition.

### TIME AND PLACE WHERE THE INJURY OCCURRED

The unlawful injury occurred during October 2007, or from March 2008 until May 2008 at the Tyson chicken plant located at Greenwood, MS as a proximate result of the negligent acts committed by LCRC. Mr. Jones became aware he contracted TB from Tyson and LCRC when he received his letter from the State of Mississippi in Feb. 2009.

### WITNESSES

Witnesses who have knowledge of this incident include:

1. Jonathon Bradley, Correctional Supervisor at Leflore County Restitution Center.
2. Allen Langdon, Commander, Leflore County Restitution Center.
3. Walter Edwards, Case Manager, Leflore County Restitution Center.
4. Unknown employees and supervisors at Leflore County Restitution Center.
5. Unknown residents of Leflore County Restitution Center.
6. Unknown employees and supervisors of the Greenwood Country Club grounds maintenance crew.
7. Unknown supervisor at Tyson who refused to allow Mr. Jones to go to the nurse's station.
8. Unknown employees of Tyson Foods, Inc. plant located in Carthage, MS.
9. Unknown employees of Tyson Foods, Inc.

### TOTAL DAMAGES SOUGHT

Claimant will accept an immediate payment of $1,000,000, settling state law and federal constitutional and statutory claims, as well as economic and medical damages.

## RESIDENCE OF CLAIMANT AT THE TIME OF THE INJURY AND AT THE TIME OF THE FILING OF THE NOTICE

Claimant's address at the time of the incident complained of was 308 Hwy 7 N

Rear, Greenwood MS 38930. Claimant's present address is 158 Lee Street, Columbus, MS

39701.

## DOCUMENTS ATTACHED

In support of Claimant's claim, the following documents are attached:

1. Highlights of the Investigative Report conducted by the People for the Ethical Treatment of Animals.
2. Senate Sub-Committee Hears Testimony on Workplace Hazards, The Charlotte Observer, May 14, 2008.
3. Occupation Hazards, October 1, 1999.
4. Letter from the Mississippi State Department of Health, informing Marvin Jones that he may have been exposed to Mycobacterium tuberculosis (TB) at Tyson.
5. Medical Records
6. Order of Sentencing, July 2007, Clay County Circuit Court
7. TB Monitoring Record

Respectfully Submitted,

Joseph R. Murray, II
MS Bar #101802
Harrison Law Office
P.O. Box 468
114 East Jefferson Street
Ripley, MS 38663

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Leflore County Restitution Center
Barbara Allen, Commander
308 Hwy 7 North Rear
Greenwood, MS 38930

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X Linda Mitchell
☐ Agent
☐ Addressee

B. Received by (Printed Name)
Linda Mitchell
C. Date of Delivery
5-26-0

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)

7009 0820 0000 8951 6597

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

## BEFORE THE MISSISSIPPI DEPARTMENT OF CORRECTIONS

## NOTICE OF CLAIM OF MARVIN JONES FOR DAMAGES

Pursuant to Miss. Code Ann. § 11-46-11, et seq., notice is hereby given for a claim for damages for racketeering, gross negligence and negligence, as well as the violation of Plaintiff's Eight, Thirteenth, and Fourteenth Amendment rights, and other federal statutes. The Leflore County Restitution Center, hereinafter "LCRC," is liable to Marvin Jones for the aforementioned torts.

## STATEMENT OF THE FACTS AND CIRCUMSTANCES WHICH CAUSED THE INJURY

The circumstances giving rise to the claim are as follows:

Claimant, Marvin Jones, contracted Mycobacterium tuberculosis (TB), a serious and often deadly infectious disease, because he was exposed to the disease while he was fulfilling the terms of his restitution while working at Tyson Food, Inc., hereinafter "Tyson." Mr. Jones only became an employee of Tyson after he was arbitrarily assigned to the chicken plant by LCRC Correctional Supervisor Jonathon Bradley.

In September of 2007, Mr. Jones was assigned to LCRC after his release from a three-month term in the Clay County jail for embezzling money from a Dollar General. LCRC immediately assigned Mr. Jones a job at Tyson, at which point he assumed the duties of a "chicken hanger." He started his assignment October 2007 and his responsibilities included, but were not limited to; hanging live chickens on a moving wire by their feet, in an unsanitary environment. Mr. Jones would have to conduct his work among chickens compelled to release feces due to the nature in which Tyson was processing the poultry. Mr.

1


EXHIBIT
B

Jones would, at times, be covered in chicken feces. The air was also filled with chicken feathers and dust, which were circulated in the plant by large fans.

These unsanitary conditions present at Tyson's food processing plants across the nation are well documented. U.S. lawmakers have also recognized the inherent danger associated with the poultry industry and voiced concern that harsh demands issued by poultry employers place poultry worker's health in jeopardy. U.S. Sen. Ted Kennedy, D-Mass., warned of the dangers poultry workers face when by testifying before Congress that "[p]oultry workers' health and safety is threatened every day in a variety of ways. Their hands are crippled by hours on an assembly line that moves too fast. They are forced to work when they are sick or seriously hurt." Mr. Jones suffered these very same injuries, and as a consequence of such documented perils of the poultry industry, LCRD knew, or should have known, of the dangers Mr. Jones was facing.

Tyson has been investigated for hiring illegal immigrants from Latin America; an area prone to TB. LCRC knew or should have known of such hiring practices and taken steps to protect restitution workers.

As a result of working in this unsanitary and unsafe environment, Mr. Jones's face, neck, and hands began to swell soon after his employment began. Mr. Jones spoke with his supervisor at Tyson about these medical ailments, and requested to see the company's nurse. His supervisor refused to allow him to go to the nurse's station.

In October of 2007, two weeks after starting work for Tyson, Mr. Jones, because of the medical ailments that developed while working at Tyson and the problematic work environment, could no longer fulfill his work obligations. He returned to LCRC where he waited for his next assignment from Jonathan Bradley, Correctional Supervisor of LCRC..

From October 2007 - December 2007, Mr. Jones was not assigned another job by LCRC, and/or Mr. Bradley and was essentially left in limbo.

Upon information and belief, failure to reassign Mr. Jones was based upon the fact he angered Mr. Bradley because he could not work for Tyson, thus negatively impacting any and all personal benefits Mr. Bradley is believed to have received from Tyson as a result of Plaintiff's placement. Upon information and belief, it was well known among residents at LCRC that Mr. Bradley wanted as many of his residents as possible to be employed by Tyson, even when other job opportunities were available.

In December 2007, Mr. Jones was finally assigned a new job at the Greenwood Country Club as a groundskeeper. Mr. Jones was able to work productively at this new job, and his new employer was satisfied with his performance.

Though he was productive in his new job, Mr. Bradley, once again, assigned him to work for Tyson in March of 2008. This was done contrary to Mr. Jones's best interest and despite the fact he had a medical condition hampering his productivity at Tyson. This decision was arbitrary and capricious, and upon information and belief, the reassignment personally benefited Mr. Bradley.

In July 2008, Mr. Jones was released from LCRC and allowed to return home. However, rather than being the final closure to a troubled chapter in his life, Mr. Jones's newfound freedom was merely a brief respite from his hardships.

In February of 2009, Mr. Jones received a fateful letter from the Mississippi State Department of Health, informing him that he may have been exposed to Mycobacterium tuberculosis (TB) at his workplace when he was employed by Tyson. Mr. Jones went to a hospital to have a tuberculin skin test performed, and soon received his diagnosis. He has tuberculosis.

3

Since his diagnosis, a deluge of agonizing symptoms has befallen Mr. Jones. He is

currently suffering from muscle spasms, acute fever, night sweats, loss of appetite, weight

loss, and a host of side effects from medications he must take. He is unable to work because

of his condition.

## TIME AND PLACE WHERE THE INJURY OCCURRED

The unlawful injury occurred during October 2007, or from March 2008 until May

2008 at the Tyson chicken plant located at Greenwood, MS as a proximate result of the

negligent acts committed by LCRC. Mr. Jones became aware he contracted TB from Tyson

and LCRC when he received his letter from the State of Mississippi in Feb. 2009.

## WITNESSES

Witnesses who have knowledge of this incident include:

1.  Jonathon Bradley, Correctional Supervisor at Leflore County Restitution Center.
2.  Allen Langdon, Commander, Leflore County Restitution Center.
3.  Walter Edwards, Case Manager, Leflore County Restitution Center.
4.  Unknown employees and supervisors at Leflore County Restitution Center.
5.  Unknown residents of Leflore County Restitution Center.
6.  Unknown employees and supervisors of the Greenwood Country Club grounds maintenance crew.
7.  Unknown supervisor at Tyson who refused to allow Mr. Jones to go to the nurse's station.
8.  Unknown employees of Tyson Foods, Inc. plant located in Carthage, MS.
9.  Unknown employees of Tyson Foods, Inc.

## TOTAL DAMAGES SOUGHT

Claimant will accept an immediate payment of $1,000,000, settling state law and

federal constitutional and statutory claims, as well as economic and medical damages.

4

## RESIDENCE OF CLAIMANT AT THE TIME OF THE INJURY AND AT THE TIME OF THE FILING OF THE NOTICE

Claimant's address at the time of the incident complained of was 308 Hwy 7 N

Rear, Greenwood MS 38930. Claimant's present address is 158 Lee Street, Columbus, MS

39701.

## DOCUMENTS ATTACHED

In support of Claimant's claim, the following documents are attached:

1. Highlights of the Investigative Report conducted by the People for the Ethical Treatment of Animals.
2. Senate Sub-Committee Hears Testimony on Workplace Hazards, The Charlotte Observer, May 14, 2008.
3. Occupation Hazards, October 1, 1999.
4. Letter from the Mississippi State Department of Health, informing Marvin Jones that he may have been exposed to Mycobacterium tuberculosis (TB) at Tyson.
5. Medical Records
6. Order of Sentencing, July 2007, Clay County Circuit Court
7. TB Monitoring Record

Respectfully Submitted,

Joseph R. Murray, II
MS Bar #101802
Harrison Law Office
P.O. Box 468
114 East Jefferson Street
Ripley, MS 38663

7009 0820 0000 8951 6580

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X _Tiffany Curtis_    ☐ Agent   ☐ Addressee <br> B. Received by (Printed Name)   C. Date of Delivery <br> _Tiffany C White_   8/27/09 |
| 1. Article Addressed to: <br><br> _MDOC – Central Office_ <br> _Christopher B. Epps, Commissioner_ <br> _723 North President Street_ <br> _Jackson Mississippi 39202_ | D. Is delivery address different from item 1? ☐ Yes <br> If YES, enter delivery address below: ☐ No <br><br> 3. Service Type <br> ☒ Certified Mail   ☐ Express Mail <br> ☐ Registered   ☒ Return Receipt for Merchandise <br> ☐ Insured Mail   ☐ C.O.D. <br> 4. Restricted Delivery? (Extra Fee)    ☐ Yes |
| 2. Article Number <br> (Transfer from service label)   7009 0820 0000 8951 6580 | |

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540



### STATE OF MISSISSIPPI
HALEY BARBOUR, GOVERNOR

## MISSISSIPPI TORT CLAIMS BOARD
J. KIRKHAM POVALL, CHAIRMAN

MIKE CHANEY, Commissioner
Insurance Department
TRUDY FISHER, Executive Director
Department of Environmental Quality
JIM HOOD, Attorney General
Office of Attorney General

September 17, 2009

TATE REEVES, Treasurer
Department of Treasury
STEPHEN B. SIMPSON, Commissioner
Department of Public Safety
KEVIN J. UPCHURCH, Executive Director
Department of Finance and Administration

**CERTIFIED MAIL NO. 7001 0320 0005 2962 9620**
**RETURN RECEIPT REQUESTED**

Honorable Joseph R. Murray, II
Harrison Law Office
Post Office Box 468
Ripley, Mississippi 38663

     Re:    State Agency: Mississippi Department of Corrections
           D/A: February 18, 2009; Claimant: Marvin Jones
           MTCB File No. 2010-0000092

Dear Mr. Murray:

      This will acknowledge receipt of your notice of claim in regards to the above referenced matter. The Mississippi Department of Corrections has forwarded this matter to our office for proper response.

      I am sure you are aware of the well established Mississippi Supreme Court case law which pertains to claims made by inmates or wrongful death beneficiaries of inmates under the Mississippi Tort Claims Act.

      Section 11-46-9 (m) which provides "A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim: (m) of any inmate who at the time claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution, regardless of whether such claimant is or is not an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution when the claim is filed."

      The Mississippi Supreme Court has consistently upheld this exemption. Should you or your client elect to proceed under the Mississippi Tort Claims Act in bringing suit against the Mississippi Department of Corrections or any of its employees you may rest assure that every possible effort to recover public funds used in the defense and dismissal of this matter will be taken.

**EXHIBIT**
C

POST OFFICE BOX 267 • JACKSON, MISSISSIPPI 39205 • 601-359-3402 • FAX 601-359-3262

## BEFORE THE MISSISSIPPI ATTORNEY GENERAL

## NOTICE OF CLAIM OF MARVIN JONES FOR DAMAGES

Pursuant to Miss. Code Ann. § 11-46-11, et seq., notice is hereby given for a claim for damages for racketeering, gross negligence and negligence, as well as the violation of Plaintiff's Eight, Thirteenth, and Fourteenth Amendment rights, and other federal statutes. The Leflore County Restitution Center and its employees, hereinafter "LCRC," is liable to Marvin Jones for the aforementioned torts.

## STATEMENT OF THE FACTS AND CIRCUMSTANCES WHICH CAUSED THE INJURY

The circumstances giving rise to the claim are as follows:

Claimant, Marvin Jones, contracted Mycobacterium tuberculosis (TB), a serious and often deadly infectious disease, because he was exposed to the disease while he was fulfilling the terms of his restitution while working at Tyson Food, Inc., hereinafter "Tyson." Mr. Jones only became an employee of Tyson after he was arbitrarily assigned to the chicken plant by LCRC Correctional Supervisor Jonathon Bradley.

In September of 2007, Mr. Jones was assigned to LCRC after his release from a three-month term in the Clay County jail for embezzling money from a Dollar General. LCRC immediately assigned Mr. Jones a job at Tyson, at which point he assumed the duties of a "chicken hanger." He started his assignment October 2007 and his responsibilities included, but were not limited to; hanging live chickens on a moving wire by their feet, in an unsanitary environment. Mr. Jones would have to conduct his work among chickens compelled to release feces due to the nature in which Tyson was processing the poultry. Mr.

1



Jones would, at times, be covered in chicken feces. The air was also filled with chicken feathers and dust, which were circulated in the plant by large fans.

These unsanitary conditions present at Tyson's food processing plants across the nation are well documented. U.S. lawmakers have also recognized the inherent danger associated with the poultry industry and voiced concern that harsh demands issued by poultry employers place poultry worker's health in jeopardy. U.S. Sen. Ted Kennedy, D-Mass., warned of the dangers poultry workers face when by testifying before Congress that "[p]oultry workers' health and safety is threatened every day in a variety of ways. Their hands are crippled by hours on an assembly line that moves too fast. They are forced to work when they are sick or seriously hurt." Mr. Jones suffered these very same injuries, and as a consequence of such documented perils of the poultry industry, LCRD knew, or should have known, of the dangers Mr. Jones was facing.

Tyson has been investigated for hiring illegal immigrants from Latin America; an area prone to TB. LCRC knew or should have known of such hiring practices and taken steps to protect restitution workers.

As a result of working in this unsanitary and unsafe environment, Mr. Jones's face, neck, and hands began to swell soon after his employment began. Mr. Jones spoke with his supervisor at Tyson about these medical ailments, and requested to see the company's nurse. His supervisor refused to allow him to go to the nurse's station.

In October of 2007, two weeks after starting work for Tyson, Mr. Jones, because of the medical ailments that developed while working at Tyson and the problematic work environment, could no longer fulfill his work obligations. He returned to LCRC where he waited for his next assignment from Jonathan Bradley, Correctional Supervisor of LCRC..

From October 2007 - December 2007, Mr. Jones was not assigned another job by LCRC, and/or Mr. Bradley and was essentially left in limbo.

Upon information and belief, failure to reassign Mr. Jones was based upon the fact he angered Mr. Bradley because he could not work for Tyson, thus negatively impacting any and all personal benefits Mr. Bradley is believed to have received from Tyson as a result of Plaintiff's placement. Upon information and belief, it was well known among residents at LCRC that Mr. Bradley wanted as many of his residents as possible to be employed by Tyson, even when other job opportunities were available.

In December 2007, Mr. Jones was finally assigned a new job at the Greenwood Country Club as a groundskeeper. Mr. Jones was able to work productively at this new job, and his new employer was satisfied with his performance.

Though he was productive in his new job, Mr. Bradley, once again, assigned him to work for Tyson in March of 2008. This was done contrary to Mr. Jones's best interest and despite the fact he had a medical condition hampering his productivity at Tyson. This decision was arbitrary and capricious, and upon information and belief, the reassignment personally benefited Mr. Bradley.

In July 2008, Mr. Jones was released from LCRC and allowed to return home. However, rather than being the final closure to a troubled chapter in his life, Mr. Jones's newfound freedom was merely a brief respite from his hardships.

In February of 2009, Mr. Jones received a fateful letter from the Mississippi State Department of Health, informing him that he may have been exposed to Mycobacterium tuberculosis (TB) at his workplace when he was employed by Tyson. Mr. Jones went to a hospital to have a tuberculin skin test performed, and soon received his diagnosis. He has tuberculosis.

3

Since his diagnosis, a deluge of agonizing symptoms has befallen Mr. Jones. He is

currently suffering from muscle spasms, acute fever, night sweats, loss of appetite, weight

loss, and a host of side effects from medications he must take. He is unable to work because

of his condition.

## TIME AND PLACE WHERE THE INJURY OCCURRED

The unlawful injury occurred during October 2007, or from March 2008 until May

2008 at the Tyson chicken plant located at Greenwood, MS as a proximate result of the

negligent acts committed by LCRC. Mr. Jones became aware he contracted TB from Tyson

and LCRC when he received his letter from the State of Mississippi in Feb. 2009.

## WITNESSES

Witnesses who have knowledge of this incident include:

1. Jonathon Bradley, Correctional Supervisor at Leflore County Restitution Center.
2. Allen Langdon, Commander, Leflore County Restitution Center.
3. Walter Edwards, Case Manager, Leflore County Restitution Center.
4. Unknown employees and supervisors at Leflore County Restitution Center.
5. Unknown residents of Leflore County Restitution Center.
6. Unknown employees and supervisors of the Greenwood Country Club grounds maintenance crew.
7. Unknown supervisor at Tyson who refused to allow Mr. Jones to go to the nurse's station.
8. Unknown employees of Tyson Foods, Inc. plant located in Carthage, MS.
9. Unknown employees of Tyson Foods, Inc.

## TOTAL DAMAGES SOUGHT

Claimant will accept an immediate payment of $1,000,000, settling state law and

federal constitutional and statutory claims, as well as economic and medical damages.

## RESIDENCE OF CLAIMANT AT THE TIME OF THE INJURY AND AT THE TIME OF THE FILING OF THE NOTICE

Claimant's address at the time of the incident complained of was 308 Hwy 7 N

Rear, Greenwood MS 38930. Claimant's present address is 158 Lee Street, Columbus, MS

39701.

## DOCUMENTS ATTACHED

In support of Claimant's claim, the following documents are attached:

1. Highlights of the Investigative Report conducted by the People for the Ethical Treatment of Animals.
2. Senate Sub-Committee Hears Testimony on Workplace Hazards, The Charlotte Observer, May 14, 2008.
3. Occupation Hazards, October 1, 1999.
4. Letter from the Mississippi State Department of Health, informing Marvin Jones that he may have been exposed to Mycobacterium tuberculosis (TB) at Tyson.
5. Medical Records
6. Order of Sentencing, July 2007, Clay County Circuit Court
7. TB Monitoring Record

Respectfully Submitted,

Joseph R. Murray, II
MS Bar #101802
Harrison Law Office
P.O. Box 468
114 East Jefferson Street
Ripley, MS 38663

7008 1300 0001 6305 8233

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ms Attorney General's Office
Walter Sillers Building
550 High Street
Suite 1200
Jackson, MS 39201

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X B. Williams ☐ Agent ☐ Addressee

B. Received by (*Printed Name*)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☒ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

2. Article Number
(*Transfer from service label*)

7008 1300 0001 6305 8233

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

# Poultry Slaughter:
# The Need for Legislation



**EXHIBIT**

tabbies

E

...esent the largest number of animals slaughtered for ...s. Nine of the ten billion animals slaughtered in US fa... ...e birds - chickens, turkeys, ducks, and others. Yet pou... ...m humane slaughter protection. The 1958 federal Hu... ...Slaughter Act does not cover birds. At the time, those... ...form of humane slaughter legislation omitted poultry... ...ng that birds would subsequently be brought under t... ...mammals. The time has come to fulfill this goal.

*"Slaughter is different from processing in that the raw material is alive, has a central nervous system, can express emotional states, and has biological components like humans."* - Dr. Janice Swanson, American Meat Institute Foundation's Annual Animal Handling and Stunning Conference, February 21-22, 2002

*"Do you think from your perception that the birds have a sense of what is going to happen to them?"*

*"Yes. They try everything in their power to get away from the [killing] machine and to get away from you. Even the ones that are stunned into immobility. If these people are trying to say, because this chicken is stunned, it doesn't know what's going to happen or doesn't know what's going on, they are lying. I stood on the kill floor and watched. They will look at you, they'll open up their mouths; they try to squawk. They'll do all that, they'll get as mobile as they can, trying to get away. They have been stunned, so their muscles don't work, but their eyes do and you can tell by them looking at you, they're scared to death."* - Virgil Butler, former Tyson slaughter-house worker, Press Conference, Little Rock, Arkansas, February 19, 2003

## Catching & Transport of Chickens and Other Birds Slaughtered for Meat

At the poultry slaughter plant each day thousands of birds are crammed inside crates stacked on trucks waiting to be killed. Truckload after truckload pulls into the holding dock where huge fans rotate to reduce the number of birds who will die of heat prostration while waiting to enter the slaughterhouse. In winter many birds freeze to death waiting to be killed. A forklift picks the topmost pallet of crates off each flatbed truck, and the birds disappear into the darkness.



They come out of the darkness. "Live haul involves hand catching the birds, mostly at night, in a darkened dust-laden atmosphere," a USDA manual explains (1). Men move into the barns clapping their hands and shouting to make room for a forklift with a 5-foot cabinet of cages. When a forklift drops a box of cages, the men corner a group of chickens, grabbing in each hand one leg each of four to five terrified birds who are hurled like footballs and stuffed in the cages like trash in a can. In the 1990s, chicken-catching machines resembling giant street sweepers were also introduced. These 6-ton machines move through the chickens, scooping up 7,000 birds an hour with rubber finger-like projections that place them on a conveyer belt. The belt carries the birds into the machine where they are placed in crates automatically. When a crate is full, a forklift loads it onto the truck. When the truck is filled with the crated birds, they are driven to the slaughterhouse.



## At the Slaughterhouse

### Shackling

At the slaughterhouse, the birds sit in the trucks without food or water for 1 to 9 hours or more waiting to be killed. Inside the plant, in the "live-hang" area, they are violently jammed into a movable metal rack that clamps them upside down by their feet. Suspending these heavy birds, most of whom are already crippled, upside down by their feet, puts a painful strain on their legs and hips. Worse, meat industry specialist Dr. Temple Grandin reports "seeing a lot of one-legged shackling" of birds (2).

### Electrical Immobilization

The birds' heads and upper bodies are then dragged through a splashing water trough called a "stunner." This water, which is cold and salted to conduct electricity, does not stun the birds. Its purpose is to immobilize them to keep them from thrashing and to paralyze the muscles of their feather follicles so their feathers will pop out easily, as well as to induce certain "meat" characteristics in their breast muscle tissue (3). For these reasons, at least 24 million chickens, turkeys, and ducks are intentionally tortured every day with volts of electricity in federally-inspected slaughterhouses, and further tortured when the machinery breaks down. A former Tyson chicken slaughterhouse worker said that when a line broke down at the plant where he worked, birds would be left hanging upside down in the stunner to drown and that he personally saw them "hang in that position for hours" (4).

### Neck-Cutting

After being dragged through the "stun" bath, the paralyzed conscious birds have their necks partially sliced by a rotating machine blade and/or a manual neck cutter. Although both carotid arteries must be quickly severed to ensure a rapid death, these arteries, which carry the oxygenated blood responsible for consciousness to the brain, and which are deeply embedded in the bird's neck, are often missed. So haphazard is neck-cutting that *The Poultry Tribune* refers to "hopefully hitting the jugular vein" of the birds at slaughter (5).

### Bleed-Out Tunnel and Scald Tank

Still alive - the industry intentionally keeps the birds


L. Parascandola


L. Parascandola


Carol McCormick

alive during the slaughter process so their hearts will continue to pump blood -- they then hang upside down for 90 seconds in a bleedout tunnel where they're supposed to die from blood loss, but millions of birds do not die, while an unspecified number of birds drown in pools of blood when the conveyer belt dips too close to the floor. Dead or alive, the birds are then dropped into tanks of semi-scalding water. In 1993, of 7 billion birds slaughtered in U.S. facilities, over 3 million birds were plunged into the scald tanks alive (6). According to a former slaughterhouse worker, when chickens are scalded alive, they "flop, scream, kick, and their eyeballs pop out of their heads. They often come out of the other end with broken bones and disfigured and missing body parts because they've struggled so much in the tank" (4).

## Ritual and Live Market Slaughter

Technically, ritual slaughter refers to "a method of slaughter whereby the animal suffers loss of consciousness by anemia of the brain caused by the simultaneous and instantaneous severance of the carotid arteries with a sharp instrument" (7). In practice, "ritual slaughter" is likely to involve severing the windpipe and jugular vein of unstunned birds and ramming the birds into bleeding cones after their throats are cut (8). At Empire Kosher, birds packed in crates on a moving belt are grabbed by one worker, held up by another to the slaughterer's blade, then hung upside down by another worker on a moving line of hooks. Blood spurts violently to the floor and the chickens thrash desperately on the hooks (9).

## Killing Unwanted Birds

### Killing Unwanted "Meat-Type" Birds
In 2002, workers at a Puerto Rican slaughter plant were videotaped beating to death 76,000 chickens with sticks, metal tubes and baseball bats because, according to a plant executive, "they did not come up to the high standards of quality which we demand" (10). In 1999, the manager of a turkey farm in Minnesota was videotaped bludgeoning sick, lame, and injured turkeys with a metal pipe and pliers and throwing the still living birds in piles as well as wringing their necks (11). Cervical dislocation, or "neck-wringing," is a standard farming practice for getting rid of unwanted birds, who are typically thrown with their broken necks on "dead piles" where they slowly and painfully suffocate.



### Killing Unwanted "Egg-Laying" Hens

*"When I visited a large egg layer operation and saw old hens that had reached the end of their productive life, I WAS HORRIFIED. Egg layers bred for maximum egg production . . . were nervous wrecks that had beaten off half their feathers by constant flapping against the cage."* - Dr. Temple Grandin, Paper presented at the National Institute of Animal Agriculture, April 4, 2001.

Because "spent" hens have no market value, few slaughter plants will take them. As a result, most of these birds are suffocated to death in dumpsters (12), then trucked to rendering facilities, or buried alive in landfills. According to Tom Hughes of the Canadian Farm Animal Trust, "The simplest method of disposal is to pack the

birds, alive, into containers, and bulldoze them into the ground." Another method is "to pack the birds into a closed truck and connect the exhaust to the body of the truck" (13). In 2003, workers at a battery-hen complex in California said that when their arms got tired from breaking the necks of 30,000 unwanted hens, they threw the live hens into wood chipping machinery, in which a piece of wood is "fed into a chipper's funnel-shaped opening, and blades on a rapidly spinning disk or drum cut it into small pieces" (14).



Mercy for Animals

### Killing Unwanted Chicks

Along with defective and slow-hatching female chicks, the U.S. egg  industry trashes 250 million male chicks as soon as they hatch because the males don't lay eggs. Instead of being sheltered by a mother's wings, the newborns are ground up alive or thrown into trashcans where they slowly suffocate on top of one another, peeping pitifully as a human foot stomps them down to make room for more chicks. Some hatcheries gas the chicks with carbon dioxide (CO2). Ruth Harrison, the author of *Animal Machines* (1964), said she stopped supporting CO2 gassing of chicks after subjecting herself to inhalation of various gas concentrations. She said, "In my opinion, it is no better than the old practice of filling up a dustbin with them and letting them suffocate" (15).

## "Humane" Slaughter Laws for Poultry

There are no federal laws governing the raising, transport, or slaughter of poultry in the United States. Although birds represent 99 percent of animals slaughtered for food in the U.S., they are excluded from the federal Humane Methods of Slaughter Act (7). Canada has an unenforceable *Recommended Code of Practice*, and the U.K leaves enforcement of its welfare laws to the Meat Hygiene Service and to an unenforceable *Ministry of Agricultural Code of Practice*. In the European Union (EU), a 1997 draft proposal by the European Commission to strengthen an EU Directive to set legally binding stunning standards for birds and mammals "seems to have disappeared" (16).

## Remedies

### Federal Legislation

Though no truly humane system of slaughter can be devised, conditions in the U.S. could be improved by redefining "livestock" in the federal Humane Methods of Slaughter Act (7) to include poultry, or by amending the 1957 Poultry Products Inspection Act (21 U.S. Code of Federal Regulations) to include a humane slaughter provision for poultry. The latter approach was tried in three bills introduced by Congressman Andrew Jacobs (Indiana) in the U.S. House of Representatives in the 1990s: H.R. 4124 (1992); H.R. 649 (1993); and H.R. 264 (1995). Despite a vigorous lobby by United Poultry Concerns, all of these bills died in the House Agricultural Livestock Subcommittee to which they were referred, and efforts to get a Senate companion bill failed. It's time to try again.

## State Anti-Cruelty Laws

In some U.S. states, the worst poultry slaughter abuses might be prosecuted under the state anti-cruelty laws, a prospect that should be investigated. States that already have humane slaughter laws should adopt amendments to include poultry, as was done in California in 1991 (17). That law excludes "spent" hens and small "game" birds, a loophole that needs to be closed. (Products sold within a state are regulated by state laws. Interstate commerce is regulated by the federal government.)

## Gas Stun-Killing of Birds

*"Because gas-stunned birds regain consciousness rapidly, they must be killed, rather than stunned, by the gas."* Peter Stevenson, *Animal Welfare Problems in UK Slaughterhouses.* Compassion In World Farming, July 2001

An increasing number of welfarists are calling for the replacement of paralytic electric shock equipment with gas-based technology that will kill the birds in the transport crates prior to shackling, thus sparing them the pain and stress of live shackling, electrical paralysis, neck cutting, and for millions of birds each year, being scalded alive. Based on the evidence, the U.K. approved, in 1995, two gas mixtures with relatively high percentages of argon (60% and 90%), an inert gas that is heavier than air and said to be fairly easy to contain. In 2001, the British government amended the U.K.'s Welfare of Animals (Slaughter or Killing) Regulations 1995 to allow higher concentrations of argon and/or nitrogen and lower concentrations of $CO_2$ to be voluntarily used in the gas stunning of poultry (18).

In 1997, poultry welfare specialist Dr. Ian Duncan of the University of Guelph in Ontario, Canada, wrote that his observation of chickens entering a tunnel containing a mixture of 30% $CO_2$, 60% argon, 8% nitrogen, and 2% oxygen convinced him that this is "the most stress-free, humane method of killing poultry ever developed" (19). He said the birds were quiet, they remained in the transport crates until dead, and the procedure was "fast, painless and efficient," with no risk of recovery from unconsciousness.

## Poultry Slaughtered Under Federal Inspection in the United States in 2001
Sources:
USDA-National Agricultural Statistics Service (NASS)  Agricultural Statistics 2003
http://www.usda.gov/nass/pubs/agstats.htm

United States: 8.9 billion birds: 8.5 billion chickens, 269 million turkeys, 26 million ducks, 14 million pounds of "miscellaneous" birds: ostriches, emus, geese, pigeons, quails, and pheasants.

## Chickens Slaughtered World Wide

World wide over 43 billion chickens are slaughtered for meat. Source: Compassion in World Farming 2003.



## References

1. A.W. Brant, et al., *Guidelines for Establishing and Operating Broiler Processing Plants.* USDA-ARS, 5/82, 23.
2. American Meat Institute Animal Handling & Stunning Conference, Feb. 21-22, 2002.
3. F. Tarver Jr., Broiler Meat Quality Following Bird Restraint and Stunning, *Broiler Industry*, 8/99, 40.
4. V. Butler, Affidavit, signed 1/30/03. www.upc-online.org.broiler/.
5. G. Watts and C. Kennett, The broiler industry, *The Poultry Tribune*, 9/95, 6-18.
6. Freedom of Information Act #94-363, Poultry Slaughtered, Condemned, and Cadavers, 6/30/94.
7. *Humane Methods of Slaughter Act*, Title 7 U.S. Code.
8. J. Regenstein, et al., Shopping Guide for the Kosher Consumer, 1987; A. Birchall, Kinder ways to kill, *New Scientist*, 5/19/90, 46; *Humane Slaughter?* (video), Farm Sanctuary.org.
9. J. Oppenheimer, A "Cutthroat" Business, *Baltimore Jewish Times*, 6/2/95, 44-49.
10. Poultry slaughter sparks outcry in Puerto Rico, *The Pawtucket Times*. 5/23/02.
11. *Meat Your Meat* (video), PETA.org.
12. T. Grandin, What Would the Public Think? National Institute of Animal Agriculture, 4/4/01; email from Dr. Steven Gross to UPC, 1/31/03.
13. M. Clifton, Starving the hens is "standard." *Animal People*, 5/00, 1, 8.
14. E. Fitzsimons, No cruelty charges in chicken killings, *San Diego Union-Tribune*, 4/11/03.
15. A. Birchall (see 8 above), 47.
16. P. Stevenson, *Animal Welfare Problems in UK Slaughterhouses*, CIWF, 2.2, 7/01.
17. CA Food and Agriculture Code, Section 19501.5.
18. Changes in Poultry Slaughter Methods, *Meat News, Meat Processing*, 12/11/01.
19. I.J.H. Duncan, *Killing Methods for Poultry*, Centre for the Study of Animal Welfare, University of Guelph, 1997.

### Further Reading

1. Karen Davis, PhD, *Prisoned Chickens, Poisoned Eggs: An Inside Look at the Modern Poultry Industry*, Book Publishing Company, Summertown, TN, 1996. Available from United Poultry Concerns, PO Box 150, Machipongo, VA 23405.

2. http://www.UPC-online.org/slaughter/

3. Cem Akin, The Serious Welfare Problems of Electrical Stunning for Poultry and the Case for Gas Killing as Means for More Humane Slaughter: http://www.kfccruelty.com/cemsgaskillmemo.html

---

United Poultry Concerns is a nonprofit organization that promotes the compassionate and respectful treatment of domestic fowl. Please join us and support our work.
Go to: http://www.upc-online.org/email
Or contact:
United Poultry Concerns
PO Box 150 * Machipongo, VA 23405
Ph: 757-678-7875 * Fax: 757-678-5070
www.UPC-online.org.



## Show Congress You Care About These Birds and Urge Your Members to Join You

The purpose of a humane slaughter law is to codify obligations already accepted by society. The absence of a law to protect poultry conveys the false notion to the public, and to those who work directly with poultry, that these birds do not suffer, or that their suffering does not matter, and that humans have no merciful obligation to birds. Please contact your Members of Congress (your two Senators and your House Representative) and urge them to sponsor and support humane slaughter legislation that covers poultry the same as mammals. The most effective letter is a personal one. It should be concise, informed, and polite.

The Honorable _____          The Honorable _____
United States Senate                    United States House of _____
Washington, DC 20510                    Washington, DC 2051_
Dear Se_____                   Dear Representative_____

To learn your Members of Congress call the Capital Switchboard: 202-224-____, or _____
www.house.gov.



6/24/2009                                    Tyson Workers Torturing Birds, Uri...

**PETA**
PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS

SEARCH

SUBSCRIBE TO PETA E-NEWS

HOME | ACTION CENTER | BLOG | TV | LITERATURE | FEATURES | KIDS | DONATE | HELP |
SHOP | ABOUT |

Action Center

Join PETA's A-Team!

Manage Your PETA E-
Mail Subscriptions

Learn
Speak
Act
Join
Give
Buy
Applaud
Share
Listen

Time to Get Active
- Five Minutes or Less
- Fifteen Minutes or
  Less
- Commitment

Make a Difference
- Kids (Ages 8-13)
- Students (Ages 13-
  23)
- Teachers
- Retirees
- Parents
- Companies
- Civic Groups

Online Activism
- Put PETA Into Your
  Web Site or Blog
  Add a Banner or Link
- Buddy Icons
  Stream PETA Videos

Outreach Tools
  Activism Guide
  FAQs

## Tyson Workers Torturing Birds, Urinating on Slaughter Line

Have you ever wondered about the ingredients in the Colonel's secret recipe chicken? If the flesh came from Tyson Foods, a major KFC supplier, there's a chance the big secret is that the bird was coated in *human waste* before reaching the dinner plate.

PETA conducted an undercover investigation in 2004/2005 at a Heflin, Alabama, Tyson slaughterhouse, but even that did not prepare us for the disgusting acts that would be documented during two 2007 investigations. On nine separate days, PETA's investigator saw workers urinating in the live-hang area, including on the conveyor belt that moves birds to slaughter.

The investigator also documented sickening cruelty to animals in both the Georgia and Tennessee slaughterhouses. Supervisors at both facilities either were directly involved in the abuse or were made aware of it by the investigator—but they did not stop it. In addition to the cuts and broken limbs suffered by live chickens at nearly every slaughterhouse, the investigator documented the following:

- One worker admitted that he broke a chicken's back by beating the bird against a rail, a back-up killer stabbed birds in the neck area with knives, and several birds were hung from shackles by their necks instead of by their legs.

- PETA's investigator caught on videotape a supervisor telling him that it was acceptable to rip the heads off live birds who had been improperly shackled by the head.

- Workers—sometimes standing 4 to 6 feet away from the conveyor belt—violently threw birds at the shackles. Some animals slammed into the shackles and fell onto birds on the conveyor belt below, at which point the worker sometimes repeated the abuse.

- Birds died when their heads and legs became trapped under a door at the end of the conveyor belt that transported live birds to be hung. A supervisor was aware of this problem but did nothing to stop it.

- The killing-machine blade often cut birds' bodies instead of their throats. Although aware of this problem, a supervisor offered no solution, instead blaming the problem on the "nature of the machine."

PETA has written to Tyson Foods and asked the company to fire all the workers who were responsible for the abuse documented in these two facilities, immediately install video cameras on all killing floors and in all hang areas, and hire its own undercover investigators to look for and report cruelty. We are also calling on Tyson and KFC to phase in a far less cruel method of slaughter known as controlled-atmosphere killing, which would eliminate worker contact with live animals.

**Please write to KFC and Tyson Foods to stop this hideous abuse.**

**Recipients**

- Laurie Schalow

**Subject**

Please End Cruelty to Chickens Raised and Killed for Your Cor...

Dear [Decision Maker],

(Edit Letter Below)

**EXHIBIT**
F

Required fields

First Name

Last Name

**6/24/2009**

> FAQs
Legislative Guide

Resources
  PETA Literature
  Factsheets
  Features
  Photos
  Videos
  Web Sites

I was shocked by the sickening cruelty to animals that PETA documented inside Tyson's Union City, Tennessee, and Cumming, Georgia, slaughterhouses. The video footage shows that birds are stabbed, punched, decapitated, and thrown violently into shackles. Even worse, the video revealed that supervisors were aware of most of the abuse but did not stop it.

I am shocked that Tyson Foods has not implemented meaningful animal welfare guidelines in its facilities and that KFC allows its suppliers to get away with it.

Tyson Foods should fire all the workers who were responsible for the abuse documented in these two facilities, immediately install video cameras on all killing floors and in all hang areas, hire its own undercover investigators to look for and report cruelty, and immediately begin phasing in the use of controlled-atmosphere killing at all

Sincerely,
[Your Name]

By signing up here and giving us your details, you're acknowledging that you've read and agreed to our privacy policy.

Your E-Mail

☑ Sign me up for PETA E-News and special announcements from PETA

Send This Message

**PETA**

501 Front St.,
Norfolk, VA 23510
757-622-PETA (7382)
757-622-0457 (fax)

**Info** About PETA | Contact PETA | Disclaimer | Donate Now | Privacy Policy

**Site Tools** Accessibility | E-Mail This Page | Site Map | Subscribe to E-News | Subscribe to Feeds

**International Sites** 🔲 ▮▮ 🔲 🔲 🔲 | PETA Asia-Pacific | PETAonEspanol

Westlaw.

5/14/08 CHAROBSVR 21

5/14/08 Charlotte Observer (N.C.) 21
2008 WLNR 9049438

Charlotte Observer (NC)
Copyright 2008 The Charlotte Observer

**May 14, 2008**

Section: NewsBroad

SENATE SUBCOMMITTEE HEARS TESTIMONY ON **WORKPLACE** HAZARDS: Lawmakers: Toughen plant penalties

AMES ALEXANDER AND LISA ZAGAROLI, Staff Writers

Saying companies that ignore **workplace** hazards face little more than a "slap on the wrist," lawmakers on Tuesday called for stiffer penalties and stronger enforcement against chronic violators.

"Poultry **workers** ' health and **safety** is threatened every day in a variety of ways," Sen. Ted Kennedy, D-Mass., said in written comments for a Senate subcommittee hearing focused on **workplace** **safety** .

"Their hands are crippled by hours on an assembly line that moves too fast. They are forced to work when they are sick or seriously hurt. Yet OSHA sits on the sidelines, ignoring such problems."

Witnesses told Kennedy and other senators on the panel that in poultry plants and other factories nationwide, grueling job conditions and preventable deaths have illustrated the need for more robust safety laws and enforcement.

It was the first of three scheduled congressional hearings prompted by a series of Observer articles focusing on working conditions in the poultry industry, where thousands of workers are hurt each year as they cut and package chicken and turkey for stores, restaurants and cafeterias.

The Observer reported that House of Raeford, a leading poultry company based in North Carolina, has masked the extent of injuries inside its plants. Employees said the company has ignored, intimidated or fired workers who were hurt on the job. The company, like many in the poultry industry, has come to rely heavily on Latino workers who often fear that complaining about job conditions may get them fired or deported.

One workplace safety expert representing a federation of unions told senators that House of Raeford represents what he sees as a growing pattern: large corporations ignoring their obligations to ensure workers aren't harmed by their jobs.



EXHIBIT

G

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 4:10-cv-00011-GHD-JMV Doc #: 12 Filed: 03/11/10 46 of 54 PageID #: 131

Eric Frumin, health and safety coordinator for union group Change to Win, testified that N.C. regulators "have utterly failed to carry out their own mandate to protect the people at House of Raeford." His 6 million-member group includes poultry, carpentry and textile workers.

House of Raeford has said it follows the law and strives to protect workers. Company officials didn't testify at the hearing and couldn't be reached for comment Tuesday. Other poultry companies say they, too, have worked to improve safety.

"The facts demonstrate we have a good record, that worker safety is a very important value in the industry, that we are concerned for our associates and employees," said Richard Lobb, a spokesman for the National Chicken Council, who did not testify at the hearing.

The Observer found that weak enforcement, minimal fines and dwindling inspections have allowed companies to operate largely unchecked.

In the poultry industry, fines for serious violations -- including conditions that could cause deaths and disabling injuries -- are usually cut by more than half, to an average of about $1,100.

"I've had young kids come up to me and say, "My dad's life was only worth $3,000?" said Jerry Scannell, who headed the U.S. Occupational Safety and Health Administration under the first President Bush. "The penalty has got to be significant enough to be a deterrent to others too."

Sen. Patty Murray, D-Wash., the subcommittee chair, spoke of the "horrifying and rampant" abuses detailed by the Observer and said she would like to see far stiffer penalties against "corporate bad actors." She and Kennedy have introduced legislation that calls for up to 40 percent higher fines -- as much as $100,000 for willful and repeat violations - and criminal penalties for repeat and willful violations of safety laws.

"I am very concerned because the evidence shows that in the last seven years, OSHA has been dangerously ineffective," Murray said.

Sen. Barack Obama, a Democrat who serves on the committee but was campaigning for the presidency in Pennsylvania, said in a written statement that "OSHA needs to be reinvigorated."

He called for additional inspectors and better ways to identify the most dangerous employers. He also said OSHA must increase penalties for violators.

Senators and witnesses at the hearing said OSHA needs to look beyond individual incidents and start hunting for unsafe patterns.

"Too frequently, the same companies are cited over and over again," Kennedy stated. "But OSHA's enforcement program fails to connect the dots."

Sen. Johnny Isakson of Georgia, the ranking Republican on the subcommittee, said higher

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

fines alone won't change a company's willingness to look the other way when it comes to unsafe conditions.

When OSHA finds companies with a pattern of workplace safety problems, it should assign compliance officers to follow up until all problems have been fixed, he said.

"It's those kinds of things that get to the meat of the coconut more than beating your chest that you tripled fines," he said.

Several lawmakers and witnesses at the hearing said the Observer's findings helped highlight the need for additional resources, better standards and the authority to impose tougher penalties.

OSHA officials say workplaces are safer than ever, pointing to a decade of declining rates of reported injuries. They credit enforcement programs and a growing recognition among industry leaders that reducing injuries is good for business.

But the Observer found that the poultry industry is more dangerous than its reports to regulators suggest. Current and former OSHA officials say the agency has made it easier for companies to hide injuries, and has all but abandoned its mission to protect workers.

One longtime poultry worker invited senators to imagine a workday at her plant.

Doris Morrow, who works at a Tyson Foods plant in Robards, Ky., brought an 18-inch-high stack of folded clothing that she said she must wear each workday to cope with frigid temperatures inside the plant. She said some workers have contracted frostbite on their hands and feet. Others, she said, have developed back problems from repeated lifting and hand injuries from the strain of making more than 25,000 cuts a day.

Many, however, won't complain about working conditions for fear of losing their jobs, she said.

Tyson Foods spokesman Gary Mickelson said Morrow's testimony included exaggerations and inaccuracies. He said the area where she works averages 46 degrees and that the company has had no reports of workers contracting frostbite. The company has reduced injuries through automation and other efforts, he said.

But Morrow said there's no question workers are suffering.

"It is time to demand that the government and companies protect workers and prevent these injuries," she said.

---- INDEX REFERENCES ----

COMPANY: OBSERVER DAILY AND SUNDAY NEWSPAPER; TYSON FOODS INC

NEWS SUBJECT: (Industrial Medicine (1IN92); Legal (1LE33); Health & Family (1HE30); HR & Labor Management (1HR87); Health & Safety (1HE24); Economics & Trade (1EC26); Government (1GO80); Legislation (1LE97); Business Management (1BU42); Occupational Safety (1WO89))

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

INDUSTRY:  (Healthcare (1HE06))

Language:  EN

OTHER INDEXING:  (Ted Kennedy; Richard Lobb; Jerry Scannell; President Bush; Patty Murray; Johnny Isakson; Doris Morrow; Gary Mickelson)  (DEMOCRAT; HOUSE OF RAEFORD; NATIONAL CHICKEN COUNCIL; OBSERVER; OSHA; SENATE; TYSON FOODS; US OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION)  (Barack Obama; Doris Morrow; Eric Frumin; Gary Mickelson; Jerry Scannell; Johnny Isakson; Kennedy; Morrow; Murray; Patty Murray; Poultry; Richard Lobb; SENATE SUBCOMMITTEE HEARS TESTIMONY; Ted Kennedy)  (North Carolina; Pennsylvania; Georgia; us; usa; na; us.nc; us.nc.charlt; us.ga; us.pa)

KEYWORDS:  (XC/NYSE);  (CT/lbr);  (NT/Labor+Employment)

TICKER SYMBOL: NYSE:TSN

EDITION: 1st

Word Count: 1309
5/14/08 CHAROBSVR 21
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

10/1/99 Occupational Hazards 16
1999 WLNR 8362886

Occupational Hazards
Copyright 1999 Penton Media, Inc.

October 1, 1999

Volume 61; Issue 10

Kentucky OSHA Widens Tyson Probe.

Five weeks after two workers died at Tyson Foods' Robards, Ky., processing plant , there has been another accident at the troubled facility.

The most recent accident occurred Aug. 30 when Keith Walsh was crushed under an elevator during cleaning operations. That is an apparent violation of OSHA lockout regulations , according to the United Food and Commercial Workers Union (UFCW). Kembra Taylor, general counsel for Kentucky's Labor Cabinet, confirmed the worker suffered "serious back and leg injuries."

In the wake of the most recent incident at Robards, UFCW renewed its call for OSHA to launch a nationwide investigation of Tyson's safety practices. In the meantime, Kentucky OSHA is engaged in three investigations of the Robards complex.

Two workers perished July 23 after falling into a pit of chicken parts at Robard's River Valley plant, which processes chicken parts for animal food. The investigation into the workers' deaths began the following day, according to Eddie Jacobs, assistant to the secretary of the cabinet for Kentucky OSHA. A second investigation at an adjacent and much-larger Robards processing facility started Aug. 17 as a result of employee complaints.

Kentucky OSHA is conducting a separate investigation of the Aug. 30 accident, Taylor said. Because all three investigations are open, she declined to comment further on any of them.

The two July fatalities appear likely to fuel a complex, ongoing dispute about the use of personal protective equipment (PPE) at the Tyson facility.

A Tyson spokesperson confirmed that the containment area where the two workers died is considered a "confined space," and asserted that both individuals had training in confined space entry. "The workers didn't use the personal protective equipment that was on site," said Ed Nicholson, who declined to speculate on the cause of their deaths.

UFCW was less guarded, charging Tyson with "recklessness" for operating "an open, pit

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


EXHIBIT

H

FOR EDUCATIONAL USE ONLY

of decomposing chicken parts." A lack of oxygen means they are "confined spaces." OSHA regulations discourage these types of confined spaces.

According to the union, the first death occurred when James Dame was lowered by a crane into the pit to retrieve a bucket that had dropped into the mixture of chicken parts. Dame, overcome by methane fumes, fell into the pit.

Mike Hallum, who Nicholson said was a supervisor at River Valley, was lowered into the pit to rescue Dame, only to suffer the same fate.

"It is immoral to require workers to risk death on the job when these tragedies are preventable," UFCW President Doug Dority said.

OSHA regulations require employers to restrict entry to confined spaces because a lack of oxygen or the presence of gases could endanger a worker. The PPE that the two workers did not use included a self-contained oxygen supply, Nicholson said.

---- INDEX REFERENCES ----

COMPANY: LAKESIDE FARM INDUSTRIES LTD; UNITED FOOD AND COMMERCIAL WORKERS PENSION FUND; TYSON FOODS INC; UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 99/CA; PPE ESMALTES LDA

NEWS SUBJECT: (Industrial Medicine (1IN92); Food & Beverage Laws (1FO27); Health & Safety (1HE24); Health, Education & Welfare (1HE31); Occupational Safety (1WO89); Health & Family (1HE30); HR & Labor Management (1HR87); Government (1GO80); Business Management (1BU42))

INDUSTRY: (Food & Beverage Production (1FO79); Meat Processing (1ME83); Agriculture, Food & Beverage (1AG53); Poultry (1PO41); Healthcare (1HE06))

REGION: (North America (1NO39); USA (1US73); Americas (1AM92); Kentucky (1KE38))

Language: EN

OTHER INDEXING: (PPE; ROBARDS; TYSON; TYSON FOODS; UFCW; UNITED FOOD) (Dame; Doug Dority; Ed Nicholson; Eddie Jacobs; James Dame; Keith Walsh; Kembra Taylor; Kentucky; Kentucky OSHA; Mike Hallum; Nicholson; OSHA; Taylor; Tyson; Tyson Probe) (Kentucky)

KEYWORDS: (Business); (Health care industry); (Dressed Poultry); (Accidents); (United States. Occupational Safety and Health Administration); (United States. Occupational Safety and Health Administration - Investigations); (Poultry industry); (Poultry industry - Accidents); (Workplace accidents); (Workplace accidents - Investigations); (Dressed poultry)

COMPANY TERMS: TYSON FOODS INC

PRODUCT: Poultry Slaughtering, Dressing & Processing; Poultry Processing

SIC: 2015

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 4:10-cv-00011-GHD-JMV Doc #: 12 Filed: 03/11/10 51 of 54 PageID #: 136

NAICS CODE: 311615

TICKER SYMBOL: TYSNA

Word Count: 563
10/1/99 OCCHZD 16
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

8/24/2009                           USATODAY.com - Tyson recruited i...



Home

News
Money
Money briefs
**Markets**
Markets Report
Most active stocks
World stocks
Commodities
Currencies
Key Interest rates
**Investor Research**
Stock Screener
Mutual funds
screener
Get a Quote
**Managing Money**
Columns and tips
Financial
calculators
CD and loan rates
**Calendars**
Economic
Company
**Special Sections**
Autos
Small Business
Careers Network
USA TODAY Travel
**Interactive**
Money eXchange
Talk Today
Sports
Life
Tech
Weather

# Money

· E-mail this story  · Subscribe to the newspaper  · Sign-up for e-mail news

12/20/2001 · Updated 03:10 AM ET

## Tyson recruited illegals, INS says

By Greg Farrell, USA TODAY

The Justice Department has accused Tyson Foods of running an illegal smuggling ring designed to recruit Latin Americans who would work harder and complain less than U.S. citizens on its payroll.

In a 36-count indictment unsealed in Tennessee, the government described a scheme through which six Tyson managers actively recruited illegal aliens from Latin America to work in 15 plants across at least seven states.

The indictment is the result of a two-year undercover operation run by the Immigration and Naturalization Service (INS).

Ken Kimbro, head of human resources at Tyson, described the government action as a "sting operation" and blamed the smuggling activities on a group of six rogue managers who had been fired or placed on administrative leave.

But the Justice Department is alleging that Tyson Foods itself participated in the smuggling. The indictment cites a meeting of human resources managers at Tyson headquarters in March of 1998, at which the directive was issued: "Never, ever admit hiring illegals."

According to the indictment, illegal aliens were desirable because their fear of deportation meant they would put up with conditions that U.S. employees would not tolerate. For example:

· They would work on faster-moving conveyor belts, making them more productive than regular employees.

· They would be allowed fewer bathroom breaks.

· They were less likely to complain to managers, file grievances with government agencies, file for workers' compensation or be absent from work.

The indictment is built around the activities of INS undercover agent Benjamin Maldonado. Responding to allegations that Tyson managers were hiring illegal Mexicans, Maldonado began serving as a procurer to Tyson managers starting in June of 1998.

During the next two years, Maldonado and other INS agents allegedly provided scores of illegal aliens, complete with stolen Social Security numbers, to various Tyson plants, collecting as much as $200 a head for their services.

They weren't paid in cash, but with checks issued by Tyson Foods. Maldonado would submit invoices requesting money for "recruitment fees," and the company would pay him.

According to a statement by Tyson's Kimbro, the company learned of the undercover operation about 18 months ago and has investigated the allegations on its own.

As a result of its own investigation, Tyson fired four managers named in the indictment and has suspended two others, "pending the outcome of this matter."





**EXHIBIT**

8/24/2009　　　　　　　　　USATODAY.com - Tyson recruited i...

USATODAY.com partners: USA WEEKEND • Sports Weekly • Education • Space.com

Home • Travel • News • Money • Sports • Life • Tech • Weather

Resources: Mobile news • Site map • FAQ • Contact us • E-mail news
Jobs with us • Internships • Terms of service • Privacy policy/Your California Privacy Right
Advertise • Press Room • Media Lounge • Electronic print edition • Reprints and Permissions

Add USATODAY.com RSS feeds XML

The Nation's Homepage

Copyright 2008 USA TODAY, a division of Gannett Co. Inc.



## MISSISSIPPI STATE DEPARTMENT OF HEALTH

February 13, 2009

Marvin Jones
1541 West Churchhill RD
West Point, MS 39773

Dear Marvin Jones,

During your employment at Tyson you may have been exposed to an individual who has been diagnosed with *Mycobacterium tuberculosis* (TB). The chance of others in the work area developing TB is small, but possible. Individuals who become infected without disease do not feel sick. However, those individuals can develop tuberculosis disease. If the infection progresses to disease, common symptoms of tuberculosis are; fever, weight loss, night sweats, and cough. If symptoms appear, promptly contact your physician or the local health department.

TB is a serious and potentially life threatening disease, but it can be detected and treated before symptoms develop. The Mississippi State Department of Health recommends that you receive a tuberculin skin test. This can be provided through the Mississippi State Department of Health free of charge.

We urge you to obtain a tuberculin skin test as soon as possible to protect your health and the health of your family and friends. Tuberculin skin tests are available at your local County Health Department on Monday, Tuesday Wednesday and Friday of each week. Please take this letter with you for free testing.

If you have any questions, please call the Leake County Health Department at 601-267-3072 between 8:00 AM and 5:00 PM Monday through Friday.

Sincerely,

Rebecca James, MD
Health Officer
Public Health District VI

**EXHIBIT**
J